CENTRAL WISCONSIN TRUST COMPANY, Executor, Appellant, vs. CHICAGO & NORTH WESTERN RAILWAY COMPANY, Respondent.

*September 11—October 10, 1939.*

For the appellant there was a brief by *Bloodgood, Kemper & Passmore,* attorneys, and *Charles H. Galin* of counsel, all of Milwaukee, and oral argument by *Eric W. Passmore.*

For the respondent there was a brief by *John F. Baker* and *John E. Krueger,* both of Milwaukee, and oral argument by *Mr. Baker.*

F<small>RITZ</small>, J.    This action was brought to recover damages sustained by reason of the death of Charles H. Osthoff as the result of alleged negligence of the defendant.    The acci-

dent, which resulted in Charles H. Osthoff's death, occurred in the defendant's Mitchell yards at Milwaukee on August 2, 1934, while Osthoff was engaged in interstate commerce in the performance of duties in the course of his employment by the defendant. Those yards are adjacent to defendant's main-line tracks from Milwaukee to Madison, and consist of a lead track that connects the main line to a series of twenty sidetracks, which are used for the purpose of storing freight cars and making up trains. The switch from the main line to the lead track is at the southeast end of the yard, and from there the lead track, and the sidetracks and their respective switch tracks, extend somewhat north of westward. As a matter of more convenient reference the movements in that direction by cars or men will be described as "westward," and movements or places to the southwest, or to the northwest of a track will be described, respectively, as the "south" or the "north," as the case may be. There was a yardmaster's office on the north side of the tracks at a point about seven hundred seventy-five feet west of the main-line switch; and the switch for sidetrack No. 17 was about six hundred seventy-five feet west of the yardmaster's office. On the day in question Osthoff, who was a freight conductor, sixty-four years of age, and in the employ of the defendant for forty-two years, had arrived at about 7:20 or 7:30 o'clock p. m. on the eastbound main line at the Mitchell yards on his regular freight-train run from Madison, and under his supervision his crew had detached and switched a train of thirteen gondola cars, with a boxcar and engine at the east end thereof, from the main line to the lead track in the southeast portion of the yards. That train was to be backed westward and yarded on one of the storage tracks. Preparatory to doing that Osthoff walked the distance of seven hundred seventy-five feet to the yardmaster's office for instructions as to where to yard the fourteen cars. Meanwhile William A. Byrne, the head brakeman, was standing on the ground to the west and north of the thirteenth gondola at the west end

of the train; and the engineer, Edward J. Martyn, and the fireman remained at their places, which were, respectively, at the south and north sides of the engine cab. The rear brakeman had remained with the cars which were left on the main line. At the office of the yardmaster Osthoff was instructed by John Holland, the yardmaster, to set the fourteen cars on track No. 17, which Holland believed was clear. He and Osthoff then stepped out of the office and while Osthoff walked the distance of six hundred seventy-five feet westward to the switch for track No. 17, Holland signaled to Byrne to have the fourteen-car train back westward. Byrne transmitted that signal to the fireman, who informed Martyn, and the latter started the train on a backward movement toward the switch for track No. 17. While the train was backing, Osthoff arrived at a switch stand, which was on the north side of the track leading to track No. 17, and set the switch for that track. He then walked from the switch stand across and to the south side of the track, and waited there while the train was being backed westward on that track at five to ten miles per hour. Meanwhile Byrne had remained on the ground while the thirteen gondola cars were passing him, and then boarded and climbed to the top of the boxcar, where he could get signals from Osthoff on the south side of the track, and transmit them to Martyn. As the west end of the train was nearing Osthoff, who was carrying two lighted lanterns and was walking westward in the space,— nine feet four inches wide,—between the south rail of the lead track and the north rail of the adjacent track to the south, he gave Byrne the regulation signal to back up. Byrne transmitted that signal to Martyn. About a minute later, while Byrne was looking toward Osthoff for signals, he saw Osthoff suddenly run toward the north and disappear without giving any further signal. Because of Osthoff's action and disappearance without any apparent reason, Byrne gave a stop signal to Martyn, who brought the train to a stop in about a car length,—forty feet,—upon receiving Byrne's

signal. At about the time the train came to a stop, there was an impact between a projection at the west end of the body of the gondola car, near its northwest corner, and the east end of the body of a boxcar, which was either standing on track No. 17 or had been left on the adjoining track No. 18 in such manner that the overhang to the southeast extended into the pathway of the northwest corner of the gondola car as it moved westward on track No. 17. The impact caused the east end of the body of the boxcar to rise in the air and the southwest wheel of the four-wheel truck under that end of the car was derailed.

The train crew found Osthoff lying dead between the rails, a little to the west of the switch points of the switch track for track No. 17. His head was toward the northwest and his right leg, which had been amputated by the accident, was to the south of the south rail. The thirteenth gondola car had passed to the west of the body which was lying under the west truck of the second car from the west end of the train. That car had partially entered onto track No. 17. The lanterns, which Osthoff had been carrying, were lying about twenty feet east of his body, and a few feet east of the switch stand and south of the south rail of the lead track. His cap was between the body and the lanterns, and either between the rails or south of the south rail. Excepting in the latter respect, there is no conflict in evidence which established the facts stated above. There is some conflict in the testimony as to whether there was any material impairment of visibility by the approaching darkness at the time of the accident; and also as to whether the boxcar, which was struck by the thirteenth gondola car, was standing on track No. 18 or track No. 17. There was no other witness than Byrne who saw Osthoff as he signaled for the train to back up while he was standing in the place of safety to the west and south of the approaching train, and as he ran from there toward the lead track. There is no proof whatsoever as to what, if anything,

he saw or heard that caused him to run, or as to how or why he got into the pathway of the train or sustained injury.

The plaintiff and appellant contends that the proximate cause of the injury and death of Osthoff was a collision and derailment of the defendant's cars, caused by negligent conduct of its employees in placing the boxcar, which was involved in the collision, on track No. 18 or track No. 17 in such a dangerous position as to obstruct traffic on track No. 17 and result in the collision when Osthoff attempted to comply with the yardmaster's orders to place his train on track No. 17; and that, therefore, the trial court erred in directing a verdict for the defendant, and in entering judgment dismissing the complaint. The court granted the defendant's motion for a directed verdict on the ground that Osthoff's rushing forward toward the track and the train was a proximate cause of his injury; that that cause constituted a new, independent and intervening cause which was not a consequence of a first negligent or wrongful cause chargeable to the defendant, was not under its control, and could not have been foreseen by it in the exercise of reasonable diligence on its part, and, except for which, the final injurious consequences would not have happened; and that because of that independent and intervening cause, the defendant was not liable under the rule that—

"Whenever a new cause [independent intervening circumstance] intervenes which is not a consequence of the first wrongful cause, which is not under the control of the wrongdoer, which could not have been foreseen by the exercise of reasonable diligence by the wrongdoer, and except for which the final injurious consequences would not have happened, then such injurious consequences must be deemed too remote to constitute the basis of a cause of action." *Morey v. Lake Superior T. & T. Co.* 125 Wis. 148, 155, 103 N. W. 271; *Byerly v. Thorpe,* 221 Wis. 28, 34, 265 N. W. 76.

In reaching the foregoing conclusions the trial court said—

". . . this case must fail because the action or conduct of the deceased Osthoff, as established by the undisputed evi-

dence, constituted the only, or sole, cause of his death. The mere fact that track 17 was obstructed either by cars standing thereon, or by the overlapping upon it of some car placed upon the next track, did not cause Mr. Osthoff's death. If he had remained in his place of safety before he ran toward the track or in which he found himself when he first noticed the alleged obstruction of track 17, he would not have been injured or killed. This is not a case where the derailment of a train or some unusual jerk or similar factor following a collision or severe impact caused injury or death. In this case, the deceased himself committed the act which caused his unfortunate death. He rushed forward for some unexplained reason, and entered what to him as an experienced freight conductor and railroad man was a well-known zone of danger. No one directed him to project himself into that zone of danger, nor was it his duty to do so."

The uncontroverted proof that the impact between the gondola and the boxcar did not occur until the train was coming to a stop, and that Osthoff's body was found under the second car, at a point which was more than a car length to the east of where the west end of the train came to a stop, compels the conclusion that Osthoff was injured prior to the occurrence of the impact. Consequently, as the trial court rightly concluded, this is not a case in which injury or death was caused by some derailment or unusual jerk or similar factor following a collision or severe impact. Whether, however, the conduct of Osthoff which brought him into the zone of danger instead of remaining in safety to the south of the track, constituted such a new, independent and intervening cause as to supersede antecedent negligence on the part of the defendant as the proximate cause of his death, depends upon whether his conduct was or was not a "normal response to the stimulus of a dangerous situation" created by some prior negligent conduct on the part of the defendant. As the court said in *New York Cent. R. Co. v. Brown* (6th Cir.), 63 Fed. (2d) 657, 658,—

"It has long been settled that the chain of causation is not broken by an intervening act which is a normal reaction to

the stimulus of a situation created by negligence, and such normal reaction has been held to include the instinct toward self-preservation, *Stott v. Shepard,* 2 W. Bl. 892 (the lighted-squib case), and the equally natural impulse to rush to others' assistance in emergency, *Wagner v. International Ry. Co.* (Cardozo, C. J.) 232 N. Y. 176, 133 N. E. 437, 19 A. L. R. 1. . . . To determine whether there was a continuous succession of events leading proximately from fault to injury, the test is not whether the plaintiff was acting in performance of his duty when injured, but whether his act was a normal response to the stimulus of a dangerous situation created by the fault." See *Kramer v. Chicago, M., St. P. & P. R. Co.* 226 Wis. 118, 129, 276 N. W. 113.

So in the case at bar, if there was any basis under the evidence for reasonably inferring that the conduct of Osthoff, which caused him to enter the zone of danger, instead of continuing to remain in the available place of safety, was but a normal response to the stimulus of a situation created by the defendant's negligence, then it would be within the province of the jury to find that its negligence was nevertheless the proximate cause of the injury to Osthoff; and in that event his intervening conduct would not constitute such an independent and superseding cause as to relieve the defendant from liability for his injury.

However, with no proof whatever that Osthoff had observed or heard anything that caused him to run toward the track or train, or as to why or how he got within its pathway, there is no basis for finding that he had become apprehensive or aware of any imminent or impending danger of injury to any person or any property, because of which his conduct, which brought him into the zone of danger, could be found to be but the normal reaction to the stimulus created by that situation. On the contrary, the proof establishes that Osthoff had but just given Byrne the regulation signal for the train to back up, pursuant to which it was continuing to do so, and there is no proof that anything had come to his attention because of which there was any occasion for him to conclude

that it was necessary to halt or alter the backward train movement. If he had become aware thereof, it would seem that, inasmuch as he had just signaled Byrne to have the backward movement continue, Osthoff's first natural impulse and normal response, upon sensing any condition which might render that operation dangerous, would be at least to attempt immediately to countermand his former signal. But there apparently was no proof of any such attempt. Under the circumstances the occasion or motive for Osthoff's coming within the zone of danger rests wholly in speculation and conjecture. Although, as a matter of mere conjecture, it may be that for some reason he believed it necessary and therefore attempted to cross the track to throw the switch so as to have the train continue on the lead track, it may likewise be conjectured, on the other hand, that he attempted to step aboard the first or second car at the west end of the train to ride, instead of walking, to track No. 17, or that, while running for that purpose or some other reason, he stumbled, or suddenly suffered some vital attack, which caused him to fall in front of, or under a car. But findings and verdicts cannot rest upon mere conjecture or speculation. *Employers Mut. Liability Ins. Co. v. Brower,* 224 Wis. 485, 272 N. W. 359; *Enders v. Sinclair Refining Co.* 220 Wis. 254, 263 N. W. 568, 265 N. W. 67. That rule is applicable to the burden, which is imposed upon an injured employee seeking to recover under the Federal Employers' Liability Act, 45 USCA, § 51 *et seq.,* to prove that the negligence of his employer was the proximate cause of his injury. *New York Cent. R. Co. v. Ambrose,* 280 U. S. 486, 489, 490, 50 Sup. Ct. 198, 74 L. Ed. 562, 565; *Gulf, M. & N. R. Co. v. Wells,* 275 U. S. 455, 48 Sup. Ct. 151, 72 L. Ed. 370. Inasmuch as the record does not admit of finding that Osthoff's conduct was the normal reaction or response under the stimulus of a condition or emergency created by the negligence of the defendant, it does not admit of finding that negligence on the part of the defendant which may have caused the impact was the

proximate cause of Osthoff's death, rather than the conduct on his part which preceded and resulted in his being fatally injured before the occurrence of the impact. Consequently, the order directing a verdict for the defendant and the judgment entered pursuant thereto must be sustained.

*By the Court.*—Judgment affirmed.

FOWLER, J. (*dissenting*). I dissent from the ruling of the court that there was no evidence to take the instant case to the jury. The opinion of the court correctly states the law that the presence of the boxcar could not be taken as a cause of Osthoff's death unless the presence of that car moved him to take the action that placed him in contact with the moving train. But from the statement of facts in the opinion it seems to me that a jury might rightly have inferred that Osthoff was so moved. They might rightly have inferred that he noticed that the boxcar was on track No. 18 with its corner projecting over track No. 17 so that a collision would occur if the train kept to track No. 17, and that to avoid such collision Osthoff ran to cross the lead track and turn the switch, to keep the train on the lead track. On no other reasonable hypothesis can his running be accounted for. Many a man has been hanged on a verdict by a jury based on inference no more reasonably drawn from the evidence. That in so running Osthoff was negligent the jury might well have inferred, but they might also have properly inferred that leaving the boxcar standing on track No. 18 was negligence on the part of the company. Upon these findings under the Federal Employers' Liability Act referred to in the opinion of the court the plaintiff would have been entitled to recover, the amount of his recovery to be reduced by his proportionate negligence. *Kalashian v. Hines,* 171 Wis. 429, 177 N. W. 602.

I am authorized to state that Mr. Justice NELSON concurs in this dissent.